UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

DORIS CHERNIK, derivatively
on behalf of Nominal Defendant
MARSH & MCLENNAN
COMPANIES, INC.

              Plaintiff,

     v.

JEFFREY GREENBERG, LEWIS W. BERNARD,
JOSHUA BEWLAY, MATHIS CABIALAVETTA,
PETER COSTER, CHARLES A. DAVIS, ROGER
EGAN, OSCAR FANJUL, RAY J. GROVES,
STEPHEN R. HARDIS, GWENDOLYN S. KING,
LORD IAN BRUCE LANG, LAWRENCE
LASSER, DAVID A. OLSEN, ROBERT J.
RAPPORT, MORTON O. SCHAPIRO,
ADELE SIMMONS, JOHN T. SINNOTT, A.J.C.
SMITH, ROBERT STEARNS, SANDRA S.
WIJNBERG, and KATHRYN WINTER,

              Defendants,

     -and-

MARSH & MCLENNAN COMPANIES, INC.,

              Nominal Defendant.

------------------------------------------------------------------------X

**05 CV 9855**

Civil Action
No.

**SHAREHOLDER
DERIVATIVE
COMPLAINT**

**JURY TRIAL
DEMANDED**



Plaintiff Doris Chernik, who has held Marsh shares for many years, by her undersigned

counsel, as and for her Shareholder Derivative Complaint ("Complaint"), alleges the following

based upon the investigation of her counsel, which included a review of Securities and Exchange

Commission ("SEC") filings by Nominal Defendant, Marsh & McLennan Companies, Inc.

("Marsh," or the"Company"), as well as regulatory filings and reports, securities analyst reports

and advisories

about the Company, press releases and media reports about the Company, as well as pleadings

filed in related litigation, including the Consolidated Class Action Complaint filed in Civil

Action No. 04-CV-08144, *In re Marsh & McLennan Companies, Inc. Securities Litigation*.

Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

forth in this Complaint after a reasonable opportunity for discovery.  The wrongful conduct of the

Defendants commenced approximately October 14, 1999, and continued at least until it began to

be substantially disclosed publicly beginning on October 14, 2004 (the "Relevant Period").

Marsh has subsequently publicly claimed to have ceased engaging in the unlawful conduct

alleged.

## SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Marsh. The Company's

Board of Directors has refused to respond to written demands made on Plaintiff's behalf on

November 15, 2004.  No claims are asserted herein against Marsh, which is a Nominal

Defendant.

2.    This action charges Defendant Jeffrey Greenberg ("Greenberg") and the other

Defendants with breach of fiduciary duty in the management of Marsh by, *inter alia*, engaging

through his subordinates in an unlawful course of conduct in which Marsh dealt with the world's

largest insurance companies to manipulate insurance contracts, obtained improper payments from

insurance companies, and misled the investing public as to the true nature of the Company's

activities, among other things.  The widespread scheme carried out by Greenberg, his

confederates and the other Defendants named herein was designed to, *inter alia*, conceal

2

Defendants' breaches of fiduciary duty with respect to the operation of the Company, conceal its true operating and financial condition, improperly steer business to preferred insurance carriers and to protect them from competition in exchange for lucrative "contingent commissions," and to enable them to remain in control of Marsh at all relevant times.   The scheme which had been created and maintained by Defendants began to fall apart in October 2004, followed by a long series of public revelations.

3.      Marsh is one of the world's largest providers of insurance brokerage and consulting services. Almost $7 billion - or roughly 60% of the Company's $11.5 billion in revenue for 2003 - came from brokering insurance to Marsh's clients. The Company holds itself out to its clients as a trusted expert in the analysis and placement of insurance policies. Businesses and individuals who need insurance retain Marsh to help them design an insurance plan and negotiate with insurance companies to get the best mix of coverage, service, financial security and price.  In theory, Marsh is supposed to obtain multiple quotes from insurance companies, present the quotes to the customer and assist the customer in choosing the most cost-effective insurance which meets the customer's needs.

4.      In fact, unbeknownst to its shareholders and customers, during the Relevant Period, Marsh was engaged in an unlawful course of business involving steering clients to insurance companies that were willing to pay kickbacks to the Company in the form of "contingent commissions." This improper steering was part of Marsh's business protocol and served as the building block of the Company's business model. Specifically, since at least the late 1990s, Marsh has designed and executed a business plan under which insurance companies agreed to pay Marsh more than $1 billion in contingent commissions to steer them business and shield

3

them from competition. Styled as payments for nebulous "services," the agreements to pay these commissions were called by Marsh "placement service agreements," ("PSAs") and, most recently, "market services agreements" ("MSAs"). As described herein, Marsh improperly manipulated the practice in order to increase the Company's revenues.

5.     During the Relevant Period, Marsh reported the revenue from these unlawful contingent commissions without disclosing that said revenue was derived from an unlawful course of business, could lead to substantial contingent liabilities, and was likely unsustainable. When Marsh was sued by Eliot Spitzer, the Attorney General of the State of New York, (the "NYAG") in October 2004, Marsh was forced to immediately cease collecting the improper contingent commissions, which constituted a substantial portion of Marsh's revenue and income.

6.     As a result of the disclosure of the foregoing and the lawsuit commenced by the NYAG, Marsh also had to agree to pay *$850 million* to partially settle policyholder claims against it.  Further, Marsh now faces huge liability as a result of the filing of policyholder lawsuits and shareholder class actions for violation of the federal securities laws.  The attorneys for the plaintiffs in the consolidated shareholder class action, *In re Marsh & McLennan Cos., Sec. Litig.,* pending in the U.S. District Court for the Southern District of New York, Docket No. 04-CV-8144 (SWK) (the "Class Action"), have filed a Consolidated Amended Complaint (the "Class Action Complaint") alleging *inter alia* that, as a result of the defendants' false and misleading statements and omissions, the Company's stock traded at artificially high prices during the period October 14, 1999 through October 13, 2004 (the "Class Period").

7.     The Class Action Complaint further alleges that after the Company's unlawful conduct and the unsustainability of its revenues from contingent commissions were revealed,

4

Marsh's share price plummeted from its opening price of $46.01 per share on October 14, 2004 to $34.05 after Attorney General Spitzer's lawsuit was announced, and plummeted further to as low as $24.10 by October 19, 2005- *a drop of $47.6% in only five days.*

8.      As further set forth below, certain of the Individual Defendants herein comprised the senior management of Marsh at the time of the unlawful conduct charged in the Spitzer complaint and the Class Action Complaint. Individually and jointly, they were and are in a position to control the affairs of the Company including the dissemination of materially false and misleading public statements as charged in the Class Action Complaint.

9.      As a consequence of this asserted wrongdoing, Marsh stands to lose many millions of dollars in damages in the Class Action. Marsh will additionally suffer damages through payment of millions of dollars in attorneys' fees and expenses in connection with defending the securities fraud charges set forth in the Class Action Complaint as well as the allegations in the various policyholder class actions. It would be unfair and inequitable for the shareholders of Marsh to bear the direct or indirect burden to pay these damages caused by the Individual Defendants, and therefore plaintiff seeks to require the Individual Defendants to make recompense to the Company.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for

5

contribution asserted pursuant to the Exchange Act.  Prior to Congress having enacted an express

provision for contribution under Section 21D of the Exchange Act, the United States Supreme

Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b)

of the Exchange Act and Rule 10b-5.  *See Musick, Peeler & Garrnett v. Employers Insurance of

Wausau*, 508 U.S. 286 (1993).  Thus, pursuant to federal statutory law and Supreme Court

authority, this Court has original federal question jurisdiction over the Federal contribution claim

alleged herein.  This Court also has subject matter jurisdiction over the pendent state law claims

asserted herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), since this statute

provides that the district court has supplemental jurisdiction over all other claims where, as here,

they are so related to claims in the action within the original jurisdiction of the Court, that they

form part of the same case or controversy.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).  A

number of the wrongful acts and practices contained of herein occurred in this District.  Nominal

defendant Marsh maintains its headquarters at 1166 Avenue of the Americas, New York, NY,  in

this District.

12.     In connection with the violations of law alleged herein, the defendants used the

means and instrumentalities of interstate commerce including the United States mail, interstate

wire and telephone facilities, the facilities of the national securities markets and the Internet to

distribute the false and misleading statements complained of herein.

## PARTIES

13.     Plaintiff Ruth Chernik purchased, owns and has owned Marsh common stock

during the Relevant Period and prior to the public disclosure of the wrongdoing set forth herein.

6

14.     Defendant Jeffrey Greenberg ("Greenberg"), was, at all relevant times, Chief Executive Officer ("CEO") and a Director of Marsh and, beginning in May 2000, Chairman of Marsh's Board of Directors.  Notwithstanding the wrongdoing alleged herein, Marsh's Board of Directors was content to keep him in office. However, in October 2004, he was asked for his resignation by the NYAG, and his "resignation" from the Company on October 25, 2004 must be deemed "for cause."  Greenberg also served as Chairman of the Board of Marsh and Chairman of its Executive Committee from May 18, 2000 until his resignation on October 25, 2004. Greenberg served as a director of the Company from 1996 until his resignation.  Greenberg profited handsomely during the Relevant Period, receiving over $19.1 million in salary and bonuses based on Marsh's reported performance in the period 1999-2004. The Class Action Complaint alleges that Greenberg made misstatements and omissions of material facts during the Class Period in violation of the Securities Exchange Act.

15.     Defendant Lewis W. Bernard ("Bernard"), is a director of Marsh and has served in that capacity since 1996. He is also Chairman of the Marsh's Compensation Committee (since 1997) and is a member of the Board's Executive Committee (since 1998).   The Class Action Complaint alleges that Bernard made misstatements and omissions of material facts during the Class Period in violation of the Securities Exchange Act.

16.     Defendant Joshua Bewlay ("Bewlay"), was employed as a Managing Director at Marsh, Inc. from 1991 through 2004.  Beginning in approximately 1998 and continuing through approximately 2003, Defendant Bewlay directed the solicitation of losing quotes from various insurance companies for excess liability insurance for Marsh clients.  On February 15, 2005, Defendant Bewlay pleaded guilty in New York Supreme Court to a scheme to defraud in

connection with rigging bids for corporate insurance contracts and steering business to insurers who paid Marsh sizable contingent commissions.

17.     Defendant Mathis Cabialavetta ("Cabialavetta"), served as Vice Chairman of Marsh, Chairman of Marsh Global Development, and as a member of Marsh's International Advisory Board. Cabialevetta served as a director of Marsh continuously from 2000 until his removal from the Board on November 18, 2004.  Cabialavetta joined Marsh in April 1999 as Vice Chairman and was subsequently appointed Vice Chairman of Marsh Europe.   Marsh announced Cabialavetta's election as a board member on May 18, 2000. The Class Action Complaint alleges that during the Relevant Period, Cabialevetta signed SEC filings containing materially false and misleading statements. Cabialevetta profited handsomely from the wrongdoing alleged herein, receiving over $13.06 million in salary and bonuses based on Marsh's performance during the period 1999-2004.

18.     Defendant Peter Coster ("Coster"), served as the President of Mercer Inc. and as a member of Marsh's Board from 1998 until his resignation in November 2004.  Coster profited handsomely from the wrongdoing alleged herein, earning over $11.95 million in salary and bonuses based on Marsh's performance during the period 1999-2004.

19.     Defendant Charles A. Davis ("Davis"), was Vice Chairman of Marsh and Chairman and CEO of Marsh Capital, Inc. He became Vice Chairman of Marsh in 1999 and has served as CEO of Marsh Capital since 1999 and as its Chairman since 2002. Beginning in 1998, he also served as President of Marsh Capital before becoming Chairman. Davis became a Board member of Marsh in 2000.   Davis profited handsomely from the wrongdoing alleged herein, earning millions in salary and bonuses based on Marsh's performance during the relevant period.

20.     Defendant Roger Egan ("Egan"), was President and Chief Operating Officer of Marsh and has served in that capacity from September 2003 until his ouster in November 2004. The Class Action Complaint alleges that, during the Relevant Period, Egan signed SEC filings containing materially false and misleading statements.  Egan profited handsomely from the wrongdoing alleged herein, earning millions in salary and bonuses based on Marsh's performance during the relevant period.

21.     Defendant, Oscar Fanjul ("Fanjul"), is a director of Marsh and has served in that capacity since September 20, 2001. Fanjul has been a member of the Marsh Board's Audit and Compensation Committees since 2001. He also is as a member of Marsh's International Advisory Board and a director of Marsh, S.A., a Spanish subsidiary of Marsh. The Class Action Complaint alleges that, during the Relevant Period, Fanjul signed SEC filings containing materially false and misleading statements.

22.     Defendant, Ray J. Groves ("Groves"), was Chairman and CEO of Marsh, Inc., from 2003 until October 15, 2004, and has been an adviser to Marsh since October 15, 2004. Groves was a director of Marsh from 1994 until his resignation on November 18, 2004. Groves also served on Marsh's Executive Committee and Compensation Committee during the Relevant Period.  The Class Action Complaint alleges that, during the Relevant Period, Groves signed SEC filings containing materially false and misleading statements.  Groves profited handsomely from the wrongdoing alleged herein, receiving over $5.28 million in salary and bonuses based on Marsh's reported performance during the relevant period.

23.     Defendant, Stephen R. Hardis ("Hardis"), has been a member of the Board of Directors of Marsh since 1998. Hardis has been a member of the Board's Audit Committee since

1998, and has served as its Chairman since 2001. The Class Action Complaint alleges that, during the Relevant Period, Hardis signed SEC filings containing false and misleading statements.

24.      Defendant Gwendolyn S. King ("King"), has been a director of Marsh since 1998. She is also a member of the Board's Audit and Governance Committees. The Class Action Complaint alleges that, during the Relevant Period, King signed SEC filings containing false and misleading statements.

25.      Defendant Lord Ian Bruce Lang of Monkton ("Lang"), has  been a director of Marsh since 1997. Lang was Chairman of the Company's Audit Committee between 1998 and 2001 and has also served on the Board's Executive, Compensation and Governance Committees. The Class Action Complaint alleges that, during the Relevant Period, Lang signed SEC filings containing false and misleading statements.

26.      Defendant, Lawrence Lasser ("Lasser"), was president and CEO of Putnam Investment Trust and a Board member of Marsh from 1987 until his resignation in November 2003. The Class Action Complaint alleges that, during the Relevant Period, Lasser signed SEC filings that contained false and misleading statements. Lasser profited handsomely from the wrongdoing alleged herein, receiving over $87 million in salary and bonuses based on Marsh's reported performance during the relevant period.

27.      Defendant, David A. Olsen ("Olsen"), has been a director of Marsh since 1997. Olsen also served as Vice Chairman of Marsh from May 1997 through December 1997. Olsen has also served as a member of the Marsh's Audit Committee since 2002. The Class Action Complaint alleges that, during the Relevant Period, Olsen signed SEC filings containing false

and misleading statements.

28.     Defendant, Robert J. Rapport ("Rapport"), served as Marsh's Vice President, Chief Accounting Officer and Controller throughout the Relevant Period.  The Class Action Complaint alleges that, during the Relevant period, Rapport signed SEC filings containing materially false and misleading statements.  He profited handsomely from the wrongdoing alleged herein, receiving millions in salary and bonuses based on Marsh's reported performance during the relevant period.

29.     Defendant Morton O. Schapiro ("Schapiro"), began service as a director of Marsh in 2002. Since becoming a director, Schapiro has served on Marsh's audit, governance and compensation committees. The Class Action Complaint alleges that, during the Relevant Period, Schapiro signed SEC filings containing false and misleading statements.

30.     Defendant Adele Simmons ("Simmons"), is a director of Marsh, having served in that capacity continuously since 1978. Simmons is a member of Marsh's Executive and Audit Committees, having served on both those committees continuously throughout the Relevant Period.  The Class Action Complaint alleges that, during this Relevant Period, Simmons signed SEC filings containing false and misleading statements.

31.     Defendant John T. Sinnott ("Sinnott"), was a director of Marsh from 1992 until April 2003. Sinnott was Chairman and CEO of Marsh, Inc. from 1999 through 2002. Sinnott continued to serve on Marsh's Board until his retirement in July 2003.  The Class Action Complaint alleges that, during the Relevant Period, Sinnott signed SEC filings containing false and misleading statements. Sinnott profited handsomely from the wrongdoing alleged herein, earning $8.75 million in salary and bonuses based on Marsh's performance during the relevant

11

period.

32.     Defendant A.J.C. Smith ("Smith"), was a director of Marsh from 1977 until his removal from the Board on November 18, 2004. Smith was Chairman of Marsh's Board from 1992 through 2000 and served as the Company's CEO from 1992 to 1999. As a Board member, Smith served on the Marsh's Executive Committee throughout the Relevant Period until November 18, 2004.  In 1999, Smith received $6.5 million in salary and bonus compensation for serving as Marsh's CEO.  The Class Action Complaint alleges that, during the Relevant Period, this time, Smith signed SEC filings containing false and misleading statements.

33.     Defendant Robert Stearns ("Stearns"), was employed, at all relevant times, as a Senior Vice President of Marsh, Inc.  He profited handsomely from the wrongdoing alleged herein, earning millions in salary and bonuses based on Marsh's performance during the relevant period. From about September 2002 to about 2004, Stearns participated in a scheme with individuals at various insurance companies to protect incumbent insurance carriers when their business was up for renewal and to maximize premiums.  As a part of said scheme, Stearns regularly instructed non-incumbent insurance companies to submit noncompetitive bids for insurance business that: (a) were higher in premium and/or more restrictive in coverage terms than bids provided by incumbent insurance companies; (b) were designed to ensure that the incumbent carriers win certain business; and (c) resulted in clients being tricked and deceived by a deceptive bidding process.  On January 6, 2005, Stearns pleaded guilty to a scheme to defraud in connection with rigging bids for corporate-insurance contracts and steering business to insurers who paid Marsh sizeable contingent commissions.

34.     Defendant Sandra S. Wijnberg ("Wijnberg"), has been a Senior Vice President

and Chief Financial Officer ("CFO") of Marsh since January 2000.  She profited handsomely

from the wrongdoing alleged herein, earning millions in salary and bonuses based on Marsh's

performance during the relevant period. The Class Action Complaint alleges that, during the

Relevant Period, Wijnberg signed SEC filings containing materially false and misleading

statements.

35.     Defendant Kathryn Winter ("Winter"), was employed, at all relevant times, as a

Managing Director in the Global Broking unit of Marsh, Inc. In 2002, Winter was promoted to

manager of the Northeast Region of the Global Broking Unit.     She profited handsomely from

the wrongdoing alleged herein, earning millions in salary and bonuses based on Marsh's

performance during the relevant period. As a Managing Director, Winter participated in a scheme

with individuals at various companies to maximize Marsh's profits by controlling the market and

protecting incumbent carriers when their business was up for renewal, and intentionally engaged

in deception and intentionally caused non-competitive quotes to be conveyed to Marsh clients

under false and fraudulent pretenses.   On January 24, 2005, Winter pleaded guilty in New York

Supreme Court to a scheme to defraud in connection with rigging bids for corporate-insurance

contracts and steering business to insurers who paid Marsh sizable contingent commissions.

36.     The Defendants identified in Paragraphs 14-35 of this Complaint are hereinafter

referred to collectively as the "Individual Defendants."  Defendants Greenberg, Bernard,

Cabialavetta, Egan, Fanjul, Groves, Hardis, Lang, Lasser, Olsen, Rapport, Schapiro, Simmons,

Sinnot, Smith and Wijnberg are hereinafter referred to as the "Class Action Individual

Defendants".  The Class Action Complaint alleges that the Class Action Individual Defendants

are liable as participants in a fraudulent scheme and course of business that operated as a fraud or

13

deceit on purchasers of Marsh securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme allegedly (i) deceived the investing public regarding Marsh's illegal activities and sources of substantial portions of its revenues, its business and finances generally, its exaggerated financial condition and the intrinsic value of Marsh securities; and (ii) caused members of the investing public to purchase Marsh securities at artificially inflated prices.

37.     The Class Action Complaint alleges that the Class Action Individual Defendants, as Marsh's officers and/or directors, were privy to confidential and proprietary information concerning Marsh, its operations and business prospects and were responsible for the truthfulness and accuracy of the Company's public statements described herein. By reason of their positions with Marsh, the Individual Defendants had access to internal Company documents, reports, and other information, including, among other things, material, adverse, non-public, information concerning the Company's revenues, business plans and contingency commissions. The Individual Defendants were also responsible for setting and establishing the Company's protocol and the Company's business model.

38.     Nominal defendant Marsh, a Delaware corporation, is a global provider of risk management, risk consulting, insurance brokering, financial solutions, and insurance program management services.  Through its subsidiary Marsh Inc., the Company also performs underwriting management and wholesale brokerage services for a wide range of clients.

## DEMAND REFUSED ALLEGATIONS

39.     Plaintiff asserts the federal and state law claims alleged in this Complaint derivatively in the right and for the benefit of Marsh to redress injuries suffered and to be

suffered by the Company as a direct result of the violations of the professional and contractual duties owed by the Individual Defendants to Marsh.

40.      This is not a  collusive action to confer subject matter jurisdiction on this Court that it would not otherwise have.

41.      Plaintiff will adequately and fairly represent the interests of Marsh and its shareholders in enforcing and prosecuting their rights.

42.      Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, on November 15, 2004, Plaintiff made written demand on the Board of Directors of Marsh to institute this action. (A copy of this demand is annexed hereto as Exhibit A.)

43.      In the almost eleven months since such demand was made, the Company has not taken the demanded action, and the demand has therefore been refused.

## DEFENDANTS' UNLAWFUL PRACTICES

44.      There are three types of entities in the insurance market. First, there are clients: companies and individuals seeking to purchase insurance for their business or personal reasons. Second, there are brokers and independent agents (collectively  "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance  company's reputation for service or claims payment. Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide  insurance for that client's risk.

45.     In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer, and (2) it pays the chosen insurance company premiums for the coverage itself.  When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients– particularly large commercial clients– break out the broker's fee and pay it directly to the broker.

46.     In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients. These are called contingent commissions and come from insurance companies pursuant to arrangements generally known as contingent commission agreements. The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

47.     In the late 1990s, defendant Marsh began to call these agreements "Placement Service Agreements" or "PSAs." After recent public scrutiny, it has renamed them "Market Services Agreements" or "MSAs," contending that they do not reflect payment for "a specific transaction or placement" but relate instead to the "services we provide" to insurance companies. Unbeknownst to Marsh's clients, these "services" include steering business to complicit and profiting insurance companies (including the Underwriter Defendants) by, among other things, rigging bids and fixing prices.  In many instances, however, the client is making a misinformed "final  decision" on insurance coverage.  As set forth below, Marsh has repeatedly provided

16

clients with rigged bids.

48.    These agreements created improper incentives for Marsh. Rather than being primarily motivated to represent insureds, the Company's motivation was to maximize its profitability by steering business to the insurance companies that would pay Marsh the largest contingent commission. As explained herein, as one Marsh executive told his subordinates, the size of the contingent commission payments to Marsh determines "who [we] are steering business to and who we are steering business from." Put in perspective, these contingent commissions, which were effectively pure profit because obtaining the commissions entailed virtually no costs to Marsh, amounted to more than $800 million, an amount equal to more than 50% of Marsh's 2003 net income of $1.5 billion.

49.    Marsh's attempts to maximize its contingent commissions did not stop at merely seeking to guide its customers (often against their best interests) to specific insurance carriers. In many cases, the Company resorted to bid-rigging to ensure that the insurance carrier that would pay Marsh the largest commission would obtain the business. Thus, Marsh designated winners in a "competitive" bidding process by structuring quotes from insurance companies to deceive its clients into believing that they were selecting the most cost-effective insurance coverage. Marsh induced insurance companies to participate in this scheme by promising to protect them from competition and by threatening to harm the business of any insurance carrier who refused to cooperate. Since the revelation of Marsh's wrongdoing in or around October 2004, eight of the Company's former employees have pleaded guilty to criminal charges arising out of the same unlawful course of conduct alleged herein.

50.    During the Relevant Period, the Individual Defendants engaged in a scheme to

boost Marsh's revenues through illegal steering and bid-rigging practices. Undisclosed to its customers, who hired Marsh to find the best and most appropriate insurance products for their needs, or the investing public who purchased Marsh securities believing that the Company's revenues were legally earned, Marsh steered its customers to insurance customers with which Marsh had arranged lucrative kick-backs.   To ensure that its clients selected the insurers that would pay Marsh the biggest kickbacks, Marsh, through its officers and directors and other executives, directed its clients to its favored insurers, regardless of the clients' needs and, in many cases, provided its clients with purportedly "competitive" bids from various insurers that were actually false bids designed to further Marsh's illegal scheme. In fact, through an elaborate bid-rigging scheme, Marsh and the various insurance companies that were supposed to be competing for the Company's clients concocted fake bids that ensured that the client's business went to the insurance company that was paying Marsh the biggest kick-back.

51.     Marsh made this fraudulent scheme an integral part of its business plan. From 1999 to 2003, Marsh's insurance and casualty division generated $1.7 billion in revenues from its illegal bid-rigging and steering activities. In 2003 alone, Marsh recognized $850 million in revenues from these activities, and through the first three quarters of 2004, Marsh generated more than $450 million in revenue from these practices.

52.     Insurance brokers are required to act as fiduciaries to their clients, serving in the clients' best interests when locating the most appropriate coverage. To that end, the broker obtains price quotes from insurance carriers and other information necessary for the client to make an informed decision. In exchange for this service and for locating the best insurer, the client pays the broker an advisory fee or commission. Marsh prided itself on the purportedly

superior level of service it provided to its clients, claiming that is "guiding principle is to consider [its] clients' best interests in all placements" and that it [does not] represent the [companies]." Moreover, the Company publicly held itself out to be a "trusted adviser and advocate, in effect representing their interest in the insurance marketplace."

53.     Unbeknownst to the public, its shareholders and its clients, Marsh engaged in an undisclosed illegal and elaborate scheme engineered by Defendant Greenberg and his subordinates and certain of the other Individual Defendants to steer business to favored insurance companies in exchange for lucrative contingent commissions over and above normal commissions paid directly and engaged in schemes to artificially raise the prices for coverage paid by its clients. In collusion with preferred insurance carriers (typically those which paid Marsh the "extra" inducements to push their coverage) Marsh, through its executives, routinely orchestrated  illusory bidding competitions in which it would designate a winner first and them urge other favored insurance companies to submit inflated bids with the understanding that Marsh would make similar favorable arrangements for them in subsequent competitions. Marsh presented clients with the fictitious high quotes from the insurance companies to create the appearance of a fair bidding competition

54.     The Individual Defendants deliberately concealed the fact that the Company's business depended for its success on these improper payments and that they were exposing the Company and its investors to tremendous liability for its wrongful conduct.

55.     Marsh's has consistently falsely promoted itself as abiding to strict principles of fidelity to its clients and has instructed its employees to repeat this pledge to its clients. In 2004, Marsh, through its senior management, instructed its employees to advise clients that:

19

> Our guiding principle is to consider our client's best interest in all placements. We are our clients' advocates and we represent them in negotiations. We don't represent the [insurance companies].

56.     Although New York law required the complete disclosure of any contingent commission agreements to a broker's clients, Marsh's executives manipulated this industry practice to boost its revenues by improperly steering clients to those insurers that would provide the maximum contingent commissions to Marsh. Further, it used every means at its disposal to avoid disclosing the true information about its practices and the amount of contingent commissions it was receiving. Thus, while contingent commissions had always existed in the insurance industry, Marsh's senior executives pioneered their manipulation.

57.     During the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation. Through acquisition and internal growth, Marsh became one of the world's dominant insurance brokers.

58.     Until the 1990s, each of Marsh's numerous branch offices throughout the United States signed its own separate contingent commission agreements with insurance carriers. However, beginning in the late 1990s, Marsh centralized the negotiation of contingent commission agreements into one unit known as Marsh Global Broking ("MGB" or "Global Broking") and assumed greater control over both business placement and contingent commission agreements.

59.     With the creation of Global Broking, Marsh's executives used the Company's size as leverage to force insurance companies to pay more in contingent commissions in exchange for Marsh placing business with the carriers. Global Broking, which was headquartered in New York, oversaw policy placement decisions in Marsh's major business lines. Global Broking was

given authority over all of Marsh's contingent commission agreements in the property and casualty lines, and began to replace smaller local and regional contingent agreements with large national ones, referred to as PSAs.

60.    Although Global Broking had been in existence prior to Defendant Greenberg's appointment as President, it became much more active under his watch in the late 1990s.  During the Relevant Period, Global Broking's nationwide regional teams were closely supervised by the New York office of Marsh.

61.    For example, beginning in 1999, coinciding with Defendant Greenberg's becoming President of Marsh, Marsh's Property and Casualty Middle-Market, the Company's largest growing segment, was mandated by management to go through Global Broking for all policy placements.

62.    A central part of management's business plan was to promote the interests of insurance companies with whom it had contingent commission agreements. When Marsh executives steered business to the favored insurance companies, those insurance companies, in turn, paid Marsh higher fees. When Marsh helped favored insurance companies retain their existing business at renewal time, those insurance companies paid Marsh higher fees. When Marsh steered more profitable business (policies with low claims ratios) to favored insurance companies, those insurance companies paid Marsh higher fees. And when the clients paid higher premiums, volume and profitability rose - - again increasing Marsh's fees.

63.    Marsh's incentive to favor certain carriers and help them retain their business was clear. For example, a Placement Service Agreement between Marsh and AIG Risk Management, Inc. ("AIG"), dated January 1, 2003, provided Marsh with a bonus of 1% of all renewal

premiums if its clients renewed with AIG at a rate of 85% or higher. If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%.

64.     Marsh's business protocol of placing business with preferred carriers extended across all lines of the Company's operations.  In furtherance of Marsh management's practice of favoring carriers based on lucrative PSAs, the Company began internally rating the insurance companies based on how much they paid pursuant to their contingent commission agreements, rather than the quality of the company, their price competitiveness or their service.

65.     For example, in February 2002, a Marsh Global Broking managing director in the Healthcare group provided nine colleagues with a list of the insurance companies that were paying Marsh pursuant to contingent commission agreements. The Managing Director cautioned, however, that "Some [contingent commission agreements] are better than others," and said that soon Marsh would formally "tier" their insurance companies. This Marsh Director went on to say, "I will give you clear direction on who [we] are steering business to and who we are steering business from."

66.     A "Tiering Report - 2003" was later circulated to Global Broking executives, listing insurance companies as belonging to tiers depending on how advantageous their contingent commission agreement was to Marsh.  The instructions to managers who received the list included a direction that they were to "monitor premium placements" to assure that Marsh obtained "maximum concentration with Tier A&B" insurance companies, those with contingent commission agreements most favorable to Marsh.

67.     In addition to rating carriers based upon how lucrative their contracts were for

Marsh, the Company's management also instituted a "pay-to-play" system through which their subordinates pressured insurance companies to enter into contingent commission agreements if they wanted to obtain business from Marsh. For example, in 2002, Marsh used a project known as the Greenville Project to try to force Zurich to enter to a contingent commission agreement.

68.     Marsh similarly used its leverage to warn ACE that in order for ACE to reach its premium growth targets for the 2004 year, it would have to increase its PSAs with Marsh. In a November 7, 2003 internal Marsh email, a Marsh employee stated, "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above market' for such stretch." The email goes on to state: "We will be candid and absolutely honest about where their PSA stands relative to similar partners in terms of both %'s and growth thresholds. We will also be VERY CLEAR to the ACE product line managers what the impact will be if they are below market in terms of PSA. "

69.     Thus, throughout the relevant period, Marsh encouraged its employees to place contracts with those insurance carriers with whom Marsh had entered into contingent commission agreements.   Marsh's steering practices were not the result of overly zealous lower level employees seeking to improve their results, but were directed by the top levels of Marsh's management.

### DEFENDANTS' UNLAWFUL SCHEME IS GRADUALLY REVEALED

70.     While the acceptance of contingent commissions by Marsh had been obliquely mentioned in various securities filings, Marsh had never let out the slightest hint that the commissions were the linchpin of its brokerage profits so that obtaining and increasing the commissions became the driving force in its brokerage business, contrary to its stated "guiding

principle" to "consider our client's best interest in all placements."  The fact that Defendants were aware of the impropriety of their "business model" is underscored by the fact that Marsh never disclosed the amount of contingent commission revenue it received and never hinted that it comprised more than one-half of the profits of its brokerage business. Moreover, by continually and falsely asserting that its clients' interests were its primary focus and that it did not "represent" insurance carriers, Marsh concealed the illicit nature of its business model from the market.

71.     On October 14, 2004, the NYAG announced that it had charged Marsh with fraud and antitrust violations stemming from its lucrative payoff agreements and solicitation of rigged bids for insurance contracts.  The New York state court complaint (the "Spitzer Complaint") implicated major insurance carriers such as ACE, AIG, The Hartford Financial Services Group ("Hartford"), and Munich American Risk Partners ("Munich"), and alleged that "[i]n addition to steering business to its insurance company partners, Marsh, at times, solicited fake bids, which deceived its customers into thinking that true competition had taken place. Marsh did this even as it claimed in public statements that its `guiding principle' was to always consider its client's best interests."  The Spitzer Complaint also exposed an internal Marsh e-mail message authored by a Company executive which stated: "We need to place our business in 2004 with those [insurance companies] that have superior financials, broad coverage and pay us the most." As recognized in the Spitzer Complaint, victims of Defendants' wrongful and illicit conduct include "Marsh's own shareholders, whom have never been told that hundreds of millions of dollars of Marsh's profits derive from illegal activities."

72.     Because the public - and, most particularly, Marsh's shareholders - were entirely unaware of the true nature of its business practices, when the true facts relating to Defendant's

wrongful conduct were revealed on October 14, 2004, the stock market's reaction was swift, decisive and overwhelmingly negative. On October 14, 2004, Marsh's stock opened at $46.01 per share. By the end of that day, it was down to $34.85 per share, a one-day decline of 24.3 percent, representing a loss of $5.9 billion in market capitalization. By October 19, 2004, Marsh's stock had declined an additional 31 percent to $24.10. Between October 14 and October 19, 2004, Marsh's stock price declined 47.6 percent and shareholders lost $11.6 billion in market capitalization.

73.     On October 15, 2004, tactically acknowledging its wrongdoing, Marsh issued a press release announcing that Defendant Ray J. Groves was resigning as the CEO of Marsh Inc., and that the Marsh was suspending its acceptance of MSA revenues. Ten days later, Marsh announced that Defendant Greenberg had resigned as the Company's Chairman and CEO.

74.     In response to the suspension of the MSAs, William Blair & Company issued a research report that stated in pertinent part:

> Suspension of MSA Represents Major Indictment The company announced last Friday that it was "suspending" the use of MSAs, which we believe is a major indictment against the use of such practices for all insurance brokers - including Aon - and represents aggressive action by Marsh & McLennan to help stem client defections and pacify regulators. This indictment is particularly serious - in our opinion - given that the company and the industry vehemently defended such compensation practices when it was announced earlier this year that regulators were scrutinizing the appropriateness of these practices.

75.     Thereafter, on October 26, 2004 Marsh issued a press release announcing that the Company was implementing "a series of significant reforms to its business model that will ensure that the best interests of its clients are served and that every transaction is executed in accordance

with the highest professional and ethical standards," thereby acknowledging the illicit nature of its

prior practices.  The press release further stated in part:

> Accordingly, the following reforms will be initiated by January 1, 2005:
>
> * Marsh has permanently eliminated the practice of receiving any form of contingent compensation from insurers.
> * All revenue streams will be 100 percent transparent to clients.
> * Each client will receive a full accounting of all revenue earned by Marsh, including fees, retail commission, wholesale commission and premium finance compensation, if any.
> * Marsh will insist that insurance companies show commission rates on all policies.

76. The wrongdoing complained of herein was not isolated to a few instances.

Rather, the improper conduct was reflective of the Company's "protocol" and "business model."

For instance, on or about February 15, 2004, defendant Joshua Bewlay, a Managing Director at

Marsh, Inc. pleaded guilty to one count of violating Section 190.65 of the NY Penal Law,

Proscribing Scheme to Defraud 1st Degree (E felony). Significantly, in his sworn plea allocution,

Bewlay stated:

> I have worked in Manhattan at Marsh, Inc. or it [sic] from 1991 through 2004.  During my employment, I was aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client addition to any fee or commission paid. The protocol required multiple layers of inquiry to discourage the client from obtaining an answer. Also that inquiries be channeled through a single Marsh employee who directed the answer to the inquiry
>
> Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of the PSA or MSA revenue earned with respect to a particular client. In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a

26

particular client.

> When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client speak only to the Marsh employee designated to respond to such inquiries.

77.     Thereafter, while apologizing for its "shameful" and "unlawful" conduct, Marsh announced the creation of an $850 million restitution fund for the Company's insurance clients that were harmed by Marsh's bid-rigging and improper steering.  This mammoth fund, representing over half of Marsh's net income for 2003 (i.e., before Marsh began taking charges to pay for the liabilities created by its unlawful contingent commissions) and almost five times its 2004 net income, is likely to represent the beginning, and not the end, of Marsh's liabilities.

78.     According to its quarterly report on Form 10-Q for the period ended June 30, 2005, Marsh now faces:

    a)      Approximately twenty-one putative class actions in the United States on behalf of policyholders;

    b)      Two policyholder class actions in Canada;

    c)      A lawsuit filed by the State of Connecticut;

    d)      Fourteen shareholder derivative actions;

    e)      Twenty class actions alleging violation of the Employee Retirement Income Security Act ("ERISA");

    f)      investigations by twenty-one state attorneys general; and

    g)      An investigation by the Australian Securities and Investments Commission.

Thus, the Company's very expensive settlement with Attorney General Spitzer in order to

27

avoid indictment is likely only the beginning of the untold sums that the Company will have to pay as a result of the unlawful conduct alleged herein.

## THE FALSE AND MISLEADING STATEMENTS ALLEGED IN THE CLASS ACTION

79.     The Class Action Complaint alleges that the result of the widespread, systematic fraud described in this Complaint, Marsh's financial results during the Class Period were materially false and misleading and violated Generally Accepted Accounting Principles ("GAAP") because, among other things: (a) Marsh's unearned commissions overstated the Company's revenues and earnings; (b) Marsh's earnings were overstated because they failed to reflect unrecorded contingent losses arising from overcharging clients and from clients' exposure to risk; (c) Marsh overstated interest income and operating income due to inflated insurance premiums; (d) Marsh failed to disclose its accounting policy for MSAs; (e) the amount of Marsh's MSA fees was material and should have been disclosed; and (f) Marsh knew and/or recklessly disregarded that its reported financial information was not indicative of future operations.  The foregoing caused Marsh's overall net income throughout the Relevant Period to be materially overstated.

80.     Additionally, the Class Action Complaint alleges that throughout the Relevant Period, Marsh's independent auditing firm, Deloitte & Touch, LLP a/k/a Deloitte Touche Tohmatsu ("Deloitte"), issued materially false and misleading audit opinions and recklessly failed to comply with GAAP.

81.     In sum, the Class Action Complaint alleges that Marsh's financial and other public statements,

including its publicly reported revenues and net income for the years 1999 through 2003 and part of 2004, were based upon an undisclosed, illegal business plan that, when it came to light, caused a decline in the Company's stock of nearly 50 percent and a loss of more than $12 billion in market value for Marsh's investors.

82.     The Class Action Complaint alleges that at all times, the Class Action Individual Defendants had direct knowledge and/or were reckless in not knowing of the true nature of the contingent commissions. As set forth in detail herein (a) the revenue from the contingent commissions was critical to Marsh's continued financial success; (b) the disclosure of contingent commissions had long been an issue that required special monitoring because of the inherent conflicts of interest therein; and (c) the unethical behavior was not the result of a few rogue employees, but was part of a well-recognized Company protocol.  The Class Action Complaint alleges that all of these facts, along with other plead in this Amended Complaint, constitute strong circumstantial evidence of conscious misbehavior and/or  severe recklessness by the Defendants.

83.     The Class Action Complaint further alleges that after the Company's unlawful conduct and the unsustainability of its revenues from contingent commissions were revealed, Marsh's share price plummeted from its opening price of $46.01 per share on October 14, 2004 to $34.05 after Attorney General Spitzer's lawsuit was announced, and plummeted further to as low as $24.10 by October 19, 2005- a drop of $47.6% in only five days.

## FIRST CAUSE OF ACTION

### (Against the Class Action Individual Defendants  for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

85.     Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

86.     These Class Action Individual Defendants have been sued in the Class Action alleging that these Individual Defendants caused the Company to issue false and misleading statements as alleged above and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

87.     It is alleged in the Class Action that these Class Action Individual Defendants acted with scienter in that these Class Action Individual Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.   These Class Action Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Marsh, their control over Marsh and its public communications, their inside knowledge of the true facts concerning Marsh's billing fraud and false and misleading reported financial results,  and/or their

30

associations with the Company which made them privy to confidential proprietary information concerning Marsh, were active and culpable participants in (and carried out) the fraudulent scheme alleged in the Class Action.   These Class Action Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.   The ongoing alleged fraudulent scheme alleged in the Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Class Action Individual Defendants.

88.   During the Class Period, it is alleged in the Class Action that the Class Action Individual Defendants caused Marsh to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (I) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Marsh securities; and (iii) cause plaintiff and other members of the Class to purchase Marsh stock at artificially inflated prices. As alleged in the Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Marsh securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

89.   In addition to the duties of full disclosure imposed on these defendants as a result

31

of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

90.     It is alleged in the Class Action that these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, and future prospects of Marsh as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Marsh's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Marsh and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Marsh securities during the Class Period.

91.     As alleged in the Class Action, as a result of the dissemination of the materially

false and misleading information and failure to disclose material facts, as set forth above, the market price of Marsh's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of Marsh's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired Marsh securities during the Class Period at artificially high prices and were damaged thereby.

92.     As alleged in the Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Marsh, which were not disclosed by these defendants, members of the Class would not have purchased or otherwise acquired their Marsh securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

93.     As alleged in the Class Action, by virtue of the foregoing, these Class Action Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

94.     It is further alleged in the Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

33

95.     If the Company is deemed to have violated the federal securities laws, and incurs damages therefor, these Class Action Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION

### Derivatively Against the Marsh Directors
### For Violations of Section 14(a) of the Exchange Act

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted derivatively against the Individual Defendants who were members of the MMC Board of Directors when the 2005 Proxy Statement was issued.

97.     This claim is asserted derivatively against the members of the Company's Board of Directors for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with the proxy statement disseminated on behalf of the Board of Directors on March 31, 2005 in connection with the Company's Annual Meeting of Shareholders scheduled and ultimately held on May 19, 2005 (the "2005 Proxy Statement").

98.     The 2005 Proxy Statement solicited the votes of Plaintiff and the other Marsh shareholders in connection with, *inter alia,* (a) the re-election of certain of the sitting directors and (b) the approval of MMC's Equity Compensation Plans to permit an exchange of certain stock options held by the Company's employees that are 25% or more "underwater."

99.     The 2005 Proxy Statement issued and disseminated to Marsh's shareholders purported to describe the activities of Marsh's Board and the committees thereof in the preceding year, setting forth, *inter alia,* the number of meetings held and what certain of such committees purportedly accomplished. The 2005 Proxy Statement went on to recommend that Marsh

34

shareholders vote in favor of the Board's proposals as referred to in the preceding paragraph, and to vote against certain resolutions proposed by shareholders not affiliated with management or the Board.

100.    The 2005 Proxy Statement contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts. In particular, the 2005 Proxy Statement failed to disclose the extent to which the Company's entire Board of Directors (and, in particular, the nominees for re-election to the Board) were responsible for the wrongdoing that caused the Company to be exposed to well in excess of $1 billion in fines, restitution, verdicts in litigation and other damages; that the exchange of options pursuant to the Equity Compensation Plans, although the exchanges would not apply to senior executive officers, would benefit many other officers of the Company and its subsidiaries who had been direct participants in and benefited from the wrongdoing described herein. Each of the foregoing material facts should have been disclosed to Marsh shareholders so that they, in voting upon the Board's proposals, would do so with the benefit of being informed of any facts material and relevant to the proposals.

101.    As a result of the use by the Company's Board of Directors of the 2005 Proxy Statement to solicit the votes of Marsh shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's proposals and nominees were approved. By utilizing such a Proxy Statement, the suffrage rights of Plaintiff and each other shareholder of the Company have been violation, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

102.    The Court should invalidate the actions taken, including ordering a new election

for directors who were improperly elected; invalidating any award of options based on the false

and misleading proxy statement; and awarding damages to the Company for the harm caused by

the Marsh Directors.

## THIRD CAUSE OF ACTION

### (Against all Individual Defendants for Breach of Fiduciary Duty)

103.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

104.    The Individual Defendants owed and owe Marsh fiduciary obligations.  By reason

of their fiduciary relationships, the Individual Defendants owed and owe Marsh the highest

obligations of good faith, fair dealing, loyalty and due care.

105.    The Defendants breached their fiduciary duties of care, loyalty, reasonable

inquiry, oversight, good faith and supervision.

106.    Each of the Defendants had actual or constructive knowledge that they had caused

Marsh to improperly misrepresent the business and prospects of the Company and/or to engage in

unlawful bid rigging.  These actions could not have been a good faith exercise of prudent

business judgment.  Moreover, the Class Action Individual Defendants are asserted to have

engaged in the actions alleged in the Class Action, which would be a breach of their duty to

conduct the business of the Company only through lawful and proper means.

107.    As a direct and proximate result of the Defendants' misconduct, Marsh has

suffered and will continue to suffer significant damages.  As a result of the misconduct alleged

36

herein, the Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against All Individual Defendants for Breach of Fiduciary Duty, Unjust Enrichment, and Abuse of Control)

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

109.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Marsh, for which they are legally responsible.  Moreover, defendants received substantial cash and non-cash payments and compensation from the Company during the Class Period while in possession of material, non-public information.  The Individual Defendants thus are required to disgorge to the Company all payments and compensation that they received while in possession of material, nonpublic information about the Company.

110.    As a direct and proximate result of the Defendants' abuse of control, Marsh has sustained significant damages, and Defendants are liable to the Company.

## FIFTH  CAUSE OF ACTION

### (Against All Individual Defendants for Breach of Fiduciary Duty Through Mismanagement)

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

112.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Marsh in a manner consistent with the operations

of a publicly held corporation.

113.    As a direct and proximate result of the Individual Defendants' gross mismanagement, Marsh has sustained significant damages arising out of the alleged material misstatements to the investing public and damages to the Company arising from the pendency of the Class Action.  The Individual Defendants are liable to the Company for all damages flowing therefrom, including the obligations for common law contribution.

## SIXTH CAUSE OF ACTION

### (Against the Individual Officer Defendants For Return of Bonuses and Incentive Payments)

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

115.    Individual Defendants as set forth herein received salary and bonuses based on the financial performance of the Company.  In fact the Company did not legitimately obtain such financial performance.  Thus the payments made to Individual Defendants were not properly earned and must be repaid to the Company.

## JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment as follows:

A.    Against the Class Action Individual Defendants for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.    Against the Marsh Directors for any damages caused by the dissemination of a

false and misleading Proxy; and for affirmative relief from the results of the vote occasioned by the false proxy

   C.  Against all of the Individual Defendants for the damages sustained by Marsh as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

   D.  Equitable and/or injunctive relief as permitted by law;

   E.  Restitution and disgorgement of unjust enrichment;

   F.  Attorneys' fees and costs; and

   G.  Any such other and further relief as may be just and proper.

Dated: New York, New York
    November 21, 2005


**ROY JACOBS & ASSOCIATES**

By: _____

   Roy L. Jacobs (RLJ 0286)
   60 East 42nd Street
   46th Floor
   New York, NY 10165
   212-867-1156
   212-504-8343

   rljacobs@pipeline.com


     and

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz (LP- 7324)
60 East 42nd Street

46th Floor
New York, NY 10165
212-685-0969
212-685-2306

classattorney@aol.com

Attorneys for Plaintiff


**OF COUNSEL:**


Law Office of Brian Felgoise, PC,
Pavilion 261 Old York Road, Ste 423
Jenkintown, PA, 19046
215-886-1900


Christopher J. Gray, Esq.
Law Offices of Christopher J. Gray, P.C.
460 Park Avenue
21st Floor
New York, NY  10022
Tel: 212-838-3221
Fax: 212-937-3139

## VERIFICATION

I, Doris Chernik, hereby declare as follows:

    1.    I am the named Plaintiff in the referenced Derivative action against the Director- Defendants and Marsh & McLennan Companies, Inc. as the Nominal Defendant.

    2.    I am currently a shareholder in Marsh & McLennan Companies, Inc. common stock.

Executed this 14<u>th</u> day of November, 2005.

<u>              </u>
Doris Chernik

# EXHIBIT A

# EXHIBIT A

# ROY JACOBS & ASSOCIATES
## ATTORNEYS AT LAW
### 60 East 42nd Street
### 46TH FLOOR
### NEW YORK, NY 10165

TEL 212-867-1156
FAX 212-504-8343

rljacobs@pipeline.com

November 15, 2004

**By Federal Express and Telecopy** (212-345-4808)

Michael G. Cherkasky
Chairman of the Board of Directors and Chief Executive Officer
Marsh & McLennan Companies Inc.
1166 Avenue of the Americas
New York, NY 10036

      Re:    Demand Letter

To the Board of Directors of Marsh & McLennan Companies Inc.

This firm represents Ms. Doris Chernik, who is, and at the times relevant to the issues addressed in this letter was a shareholder of Marsh & McLennan Companies Inc. ("MMC" or the "Company"). This letter constitutes a demand that the MMC Board take appropriate legal action against those responsible for damages caused the Company, as discussed herein.

On October 14, 2004, the New York State Attorney General announced the filing of a lawsuit against MMC and Marsh Inc. ("Marsh"), MMC's principal insurance broker subsidiary, alleging a vast conspiracy whereby insurance companies paid Marsh "contingent commissions" to steer them business. Rather than obtaining the best deal for the insurance customer, Marsh obtained the best deal for Marsh. Thus, the size of the contingent commission determined which insurance company received the placement of the policy. The interests of Marsh's customers, *viz.* those seeking insurance coverage, and the entities which Marsh purported to represent to obtain for them the best policy coverage and/or the best rate, were sacrificed. The scheme even included the obtaining of fictitious high quotes from insurers to deceive Marsh's customers into believing that actual competition had occurred in the placement of the insurance, when in fact the outcome was predetermined. In 2003 alone, MMC generated $800 million in earnings attributable to "contingent commissions." MMC has set aside $232 million as a reserve with regard to the possible costs of resolving the New York State suit.

To the Board of Directors of Marsh & McLennan Companies Inc.
November 15, 2004
Page 2

As a result, MMC has been sued in several class action lawsuits alleging violation of the federal securities laws arising out of the alleged failure to disclose *inter alia* the true nature of its business activities, and claims with respect to the veracity of its reported financial results.   It is anticipated that antitrust class actions will be filed on behalf of Marsh's customers against Marsh and/or  MMC and possibly others, asserting violations of the Sherman Anti-Trust Act, and/or the Racketeer Influenced and Corrupt Organizations Act. At least three suits have already been filed by policyholders, and more may be expected.

MMC's share price has crashed, losing 50 percent of its value and wiping out billions of shareholder market value.  MMC's commercial paper has become unmarketable, and the Company has had to obtain temporary waivers from its lenders to obtain needed working capital.

Further, it was recently reported that senior executives of MMC and members of its Board have invested in various private MMC owned funds.  While the exact nature of this arrangement is not known, it does appear that purported MMC independent directors have made significant investments in these funds, along with MMC executives.

MMC faces potentially ruinous liability as a result of the conduct now disclosed.  My client hereby demands that the Board of Directors launch a full and complete investigation into the events involving the entire litany of alleged wrongdoing to determine who was responsible and to hold them financially accountable to the Company for their breaches of fiduciary duty, or other wrongdoing.

As stated above, this is a demand letter to provide to the Board of Directors the first opportunity to institute legal action on behalf of the Company against the fiduciaries and others responsible  for the current and past wrongdoing which has caused such damage to MMC.  If you fail to respond or contact me within 60 days of the receipt of this letter, my client will assume that the MMC Board has decided not to pursue these claims and it will feel free to institute an action in State or Federal court to obtain the remedies we are asking the MMC Board to obtain.

If you have any questions concerning or wish to discuss any of the matters discussed above, please do not hesitate to contact me, or my colleague, Brian M. Felgoise, Esq. Law Offices of Brian Felgoise, 261 Old York Road, Jenkintown, PA, 19046, 215-886-1900.

Very truly yours,

Roy L. Jacobs